RECEIVED
NOV 3 0 2005

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| GRANT RENO | CIVIL ACTION NO. 04-2298 |
| VS. | JUDGE MELANÇON |
| JO ANNE BARNHART, Commissioner<br>Social Security Administration | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **AFFIRMED** and the case be **DISMISSED**.

### *Background*

Born on March 27, 1966, Grant Reno ("Reno") is 39 years old and has a twelfth grade education. Reno worked in the past as a bagger, cook, lifeguard, and offshore galley hand. On June 12, 2002, Reno applied for supplemental security income alleging disability due to head, neck, and shoulder pain.[1] Reno also alleges a mental disability due to a head injury, with subsequent brain surgery, that he suffered in 1995 when he was hit in the head while at work. Reno's application was denied on initial review, and an administrative hearing was held on July 29, 2003.[2] In an opinion dated May 27, 2004, the ALJ found that Reno is able to perform medium work, but should avoid working with his hands above his head.[3] Since Reno's

---

[1] Tr. 73, 78. Prior to the instant application, Reno filed an application for SSI benefits on March 29, 2000. The application was denied and Reno did not seek reconsideration or appeal, thus, the issue of Weston's disability is res judicata as of October 11, 2000, the date of the unfavorable decision. Tr. 47-50, 70-71.

[2] Tr. 181-216.

[3] Tr. 23.

limitations do not allow him to perform the full range of medium work, the ALJ used the Medical Vocation Guidelines only as a framework for the decision. The ALJ considered whether Reno could perform unskilled medium work and whether a sufficient number of jobs exist in that exertional level.[4] Relying on the Guidelines, Rule 2003.00 of Appendix 2, and Social Security Ruling 85-15 as a framework, the ALJ concluded that Reno was not disabled because there are jobs which exist in substantial number which Reno could perform.[5] The Appeals Council denied review and Reno timely filed this appeal.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate

---

[4] Tr. 24. Although the ALJ referred to sedentary work, it appears that this may have been a clerical error. Regardless, the record supports the ALJ's decision, as set forth below.

[5] Tr. 12-20.

only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

### *Procedure for Analysis of Impairments and the ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.[6]

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

---

[6] "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir.1985).

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed.Appx. 652 (5th Cir. 2002) (unpublished).[7]

In the instant case, the ALJ determined that Reno's head injury with subsequent brain surgery was a severe impairment.[8] The ALJ assessed Reno's residual functional capacity ("RFC") and concluded that Reno could perform all exertional levels of medium work. Applying the Medical Vocational Guidelines, the ALJ concluded that Reno was not disabled.

### *Assignment of Errors*

Reno alleges the following grounds for appeal: 1) the ALJ erred in disregarding the consultative psychologist's conclusion that additional testing was necessary to diagnose the severity of his neurological condition; 2) the ALJ erred in failing to fully and fairly develop the record; 3) the ALJ improperly relied on incomplete and inconclusive medical evidence regarding

---

[7] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004):

1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment.
2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3).
3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings.
4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity.

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

[8] Tr. 21.

Reno's mental impairments; 4) the ALJ erred in concluding that plaintiff's subjective complaints of pain were not supported by objective medical findings.

*Findings and Conclusion*

1. **Medical History**

Reno was struck on the head and neck by a board while at work. The date of the accident is unclear: Reno's application identifies the accident as happening in July of 1995 and in his history given to consultative examiners he dated the accident in 1995, however, there are no medical records from 1995 and the first medical record discussing the timing of the accident is a July 26, 1996 report from Dauterive Hospital which states, "30 year old male who was seen here 2 weeks ago after being hit in head."[9] A July 18, 1996 Discharge Summary from Lafayette General Medical Center ("LGMC") indicates that Reno was hospitalized from July 14-18, 1996 after being struck in the head.[10] Further, on July 25, 1996, Reno was examined at LGMC and stated that "he was hit on head 'last Sunday' (almost 2wks ago)."[11] However, Reno's earnings records show that Reno last worked in 1995 and that he had zero earnings in 1996 and thereafter.[12] The record also indicates that a substantial period of time may have passed between Reno's initial injury and the brain surgery which occurred in 1996.[13] Furthermore, a consulting psychologist found that Reno's memory about the time lines was "poor."[14] It is possible that the

---

[9] Tr. 186.

[10] Tr. 194.

[11] Tr. 193.

[12] Tr. 76.

[13] Tr. 167, 212.

[14] Tr. 212.

history Reno gave of his injury when seeking treatment in 1996 was wrong. In any event, the undersigned will assume, as did the ALJ, that Reno's accident occurred in 1995.[15]

Likewise, the circumstances surrounding the injury are also unclear: In his application, Reno stated that he was hurt in an on-the-job accident,[16] and he told consultative examiners that he was injured when scaffolding fell on his head,[17] however a July 14, 1996 report from LGMC states that Reno was injured in an altercation where he was struck from behind with a 2 x 4.[18] Despite these discrepancies, there is no dispute that Reno suffered a head injury for which he underwent surgery in 1996, and for which he obtained other medical treatment as shown by the administrative record.

A July, 1996 CT scan of the head showed a subacute subdural hematoma on the left side.[19] Reno was admitted into LGMC on July 27, 1996 and underwent a "left lateral frontal and temporal bur holes with washout of chronic subdural hematoma."[20] Reno recovered well and was discharged on July 30, 1996.

On November 25, 1998, Reno was examined at University Medical Center ("UMC") reporting that he injured his neck in a motor vehicle accident.[21] An x-ray showed an abnormal configuration of the C4-5 region. On March 12, 1999, another x-ray was taken of Reno's neck in

---

[15] Tr. 19.

[16] Tr. 112.

[17] Tr. 212.

[18] Tr. 194.

[19] Tr. 191.

[20] Tr. 187-189.

[21] Tr. 203A.

order to identify the source of his neck pain.[22] The x-ray showed early anterior osteophyte of the C4, but otherwise was a normal study.

On May 26, 1999, magnetic resonance imaging ("MRI") showed a spur formation which encroached upon the left neural foramen at C2-C3, but there was no focal disc extrusion or spinal stenosis identified.[23]

On June 1, 2000, at the request of Disability Determination Services ("DDS"), Dr. Randall Horton, a general practicioner, performed a consultative examination of Reno.[24] Reno reported that his primary disabling problems were headaches and neck and shoulder pain. Dr. Horton concluded that Reno may have significant discomfort that may affect his ability to perform heavy labor, however, the physical examination was inconclusive, not clearly indicating any significant limitations on Reno's ability to work.

On December 6, 2000, Reno was examined at Dauterive Hospital for neck and shoulder pain.[25] Reno was prescribed Ultram for pain relief.

On April 18, 2002, Reno was examined at UMC reporting that he had pain off and on in his back and neck.[26] Reno was given Darvocet for pain and referred to the neurosurgery clinic at LSU Health Sciences Center, Medical Center of Louisiana in New Orleans ("LSU-New Orleans").

---

[22] Tr. 203.

[23] Tr. 202.

[24] Tr. 146-147.

[25] Tr. 185.

[26] Tr. 199-201.

At the request of DDS, Reno was examined by Dr. Harold Heitkamp, a general surgeon, on August 29, 2002.[27] Reno complained of headaches and pain in the left side of his neck. Dr. Heitkamp noted that Reno had no spasm, however, he had a decreased range of motion in his cervical and lumbar spine and decreased sensation to pinprick in the left arm and lower extremity. No other neurological deficits were shown. Dr. Heitkamp reported that further testing would be needed to rule out a herniated cervical disc, and to determine whether Reno's complaints were due to physical problems or psychological overlay.[28] Dr. Heitkamp concluded his report as follows:

> I feel it is difficult to give any definite status report on this patient with his findings showing some tenderness in the cervical area and his stocking glove findings in his left arm and leg. I find no neurological deficits except loss of sensation to the left upper and entire lower extremity. His blood pressure was normal, taken with a large cup. His visual acuity is only 20/40 right and 20/50 left eye, he says he cannot afford glasses. At this time I feel, not having any reports on the cervical spine, that he can do light to medium work. No lifting over 30 or 35 lbs occasionally. No working with his hands above his head. He can sit and walk to tolerance. Some limitation in his squatting and frequent bending of his lumbar sacral spine. I feel for a full evaluation we will need the results of the MRI of the cervical spine and the brain and possibly evaluation by a psychologist.[29]

On September 3, 2002, Reno was seen at the neurosurgery clinic at LSU-New Orleans for neck pain that had gotten worse over the last year.[30] Reno reported that the pain was not relieved with medication except for Lortab. On exam, it was noted that Reno had limited range of motion

---

[27] Tr. 167-170.

[28] Tr. 170.

[29] Tr. 170.

[30] Tr. 210.

in his left shoulder and weakness in his hand secondary to pain and lack of effort.[31] The neurosurgery clinic ordered MRIs of the cervical spine and head.[32] On December 11, 2002, an MRI scan of the brain was normal.[33] An MRI of the cervical spine showed, "Moderate degenerative changes with posterior vertebral spondylosis at C2-3 level. Moderate degenerative arthritic changes in the C5-6 and C6-7 apophyseal joints. There is no stenosis of the spinal canal or neural foramina seen."[34] In 2003, it was noted that the scans were normal and Reno was discharged from the neurosurgery clinic.[35]

On May 12, 2003, Reno was examined at Dauterive Hospital complaining of difficulty walking and right leg pain.[36] X-rays of the pelvis were normal except for mild sclerosis.

On February 17, 2004, at the request of DDS, a consultative psychological evaluation was performed by Dr. Henry LaGarde, a clinical psychologist.[37] Dr. LaGarde reviewed a copy of Dr. Heitkamp's report, but he did not have copies of the neurological exams done at the neurosurgery clinic at LSU-New Orleans. Reno reported that in 1995, a piece of scaffolding fell on his head while he was work. Dr. LaGarde noted that Reno made frequent references to the accident; that his thought processes seemed perplexed; and that his short-term memory may be impaired, but his long-term memory was mostly intact, except for details about his accident. Dr.

---

[31] Tr. 210.

[32] Tr. 209.

[33] Tr. 206-208.

[34] Tr. 207.

[35] Tr. 204.

[36] Tr. 184.

[37] Tr. 212-214.

LaGarde noted that Reno was incarcerated for 18 months in 1998-1999 for distribution of cocaine, and he admitted daily use of cocaine at one point, however, he last used cocaine in 2000. Dr. LaGarde concluded:

> Diagnosis at this point will be No Diagnosis because of indications of deliberate exaggeration of symptomology for secondary gain. It is important that Mr. Reno's report of injury be clarified by complete neurological and possibly neuropsychological evaluation so that better distinctions can be made about physical versus psychological etiology for the symptoms. Once a clear neurological finding is obtained, it would be easier to make decisions about injury effects. Therefore, no diagnoses or opinions about work status are forthcoming at this time. General impression is that Mr. Reno is prone to exaggerate symptomology and thereby invalidate results of this evaluation.[38]

## 2. **Failure to develop the record**

Reno maintains that the ALJ erred in not obtaining a consultative neurological and possibly neuropsychological evaluations as suggested by Dr. LaGarde. Reno argues that the record was incomplete and the ALJ had no conclusive medical evidence regarding Reno's mental impairments.

An administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits. *See* Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000); Brock v. Chater, 84 F.3d 726 (5th Cir.1996); Kane v. Heckler, 731 F.2d 1216 (5th Cir.1984). The decision of an ALJ will be reversed for failure to fully and fairly develop the record if the claimant shows: 1) that the ALJ failed to fulfill his duty to adequately develop the record, and 2) the claimant was prejudiced thereby. *See* Carey 230 F.3d 131; Brock, 84 F.3d at 728; Kane, 731 F.2d at 1220. To establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result." Kane, supra.

---

[38] Tr. 214.

Additionally, the ALJ has the discretion to order a consultative examination. Jones v. Bowen, 829 F.2d 524 (5th Cir. 1987). An examination at government expense is not required "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." Turner v. Califano, 563 F.2d 669 (5th Cir. 1977).

Reno maintains that since Dr. LaGarde indicated that neurological evaluations may be necessary for a final diagnosis concerning his mental problems, the ALJ was required to explain why he did not adopt that recommendation. Further, Reno argues that, "[T]he neurological and neuropsychological evaluations that the ALJ refused to order could have very likely adduced medical evidence that might have altered the result of plaintiff's disability inquiry," and therefore, Reno was prejudiced by the failure to develop the record.[39]

Reno overlooks the fact that he was examined at the neurosurgery clinic at LSU-New Orleans. His examinations there included MRI scans of the neck and head. There were no neurological deficits noted on physical examination, and after the MRI scans were normal, Reno was discharged from the clinic. It is important to note that although Drs. Heitkamp and LaGarde recommended obtaining neurological information and additional testing prior to rendering a conclusive diagnosis, neither of these doctors had the medical records from the neurosurgery clinic at LSU-New Orleans. Moreover, Dr. Heitkamp's concern was whether there was disc herniation, and since the MRI of the cervical spine did not show herniation, there is nothing in the record that casts doubt on Dr. Heitkamp's opinion that Reno could perform light to medium level work.

---

[39] Rec. Doc. 5 at p. 6.

Furthermore, Dr. LaGarde clearly believed that Reno's complaints were exaggerated and that he demonstrated "selective memory."[40] Dr. LaGarde suggested "complete neurological and possibly neuropsychological evaluation" so that "Mr. Reno's report of injury be clarified."[41] Again, Dr. LaGarde was not aware that neurological evaluations had already taken place. Furthermore, he did not find any strong evidence of mental disability, but noted that previous examiners had suspected "strong psychological overlay."[42]

No doctor has indicated that Reno's brain injury caused him to sustain a mental impairment that precludes work activity. Although a consultative evaluation by a neurosurgeon and/or neuropsychologist may have elaborated on the information already in the record, there is no basis to conclude that the information was required to complete the record. Further, Reno has not presented any persuasive argument or information that had additional consultative evaluations been performed, the ALJ would have found that Reno was disabled. Considering that the neurosurgery clinic at LSU-New Orleans did not identify any significant impairments, and that Dr. Heitkamp found that Reno could perform light to medium work and Dr. LaGarde concluded that Reno's complaints of mental problems were exaggerated, the record contains sufficient information on which the ALJ could base his decision. Accordingly, the undersigned concludes that the ALJ did not fail to develop the record.

3. **Allegations of disabling pain**

Reno maintains that the ALJ gave no credence to his complaints of severe, chronic headaches and neck pain.

---

[40] Tr. 214.

[41] Tr. 214.

[42] Tr. 214.

The Fifth Circuit has held that pain, in and of itself, can be a disabling condition, but only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir.1991). The ALJ has discretion to determine the disabling nature of subjective complaints of pain, "at least where the medical evidence is inconclusive." Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). The ALJ's determination in this regard is entitled to considerable deference. Id. However, if uncontroverted medical evidence reveals a basis for the subjective complaints of pain, the "ALJ's unfavorable credibility evaluation of a claimant's complaints of pain will not be upheld on judicial review . . . at least where the ALJ does not on an articulated basis weigh the objective medical evidence in assigning reasons for discrediting the claimant's subjective complaints of pain." Cook v. Heckler, 750 F.2d at 395.

The ALJ's decision notes that Reno testified that he has severe headaches on a daily basis and his legs are sometimes numb and give out on him. The ALJ noted that the MRIs of the brain and cervical spine were essentially normal and that the medical records do not evidence any profound problems. The ALJ concluded that although Reno's complaints were partially credible, the record did not support Reno's allegation of total disability. Considering Reno's allegations of pain and the medical evidence, the ALJ concluded that Reno could perform medium work, but he should avoid working with his hands above his head.

Considering the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision to discredit Reno's subjective complaints of disabling pain and discomfort. By limiting Reno from performing the heavy duty work that he performed in the past, the ALJ acknowledged that Reno was in some pain. There is substantial evidence in the record to support the ALJ's conclusion that Reno does not suffer from disabling pain. The

medical evidence shows that he had no neurological deficit or nerve impingement which would explain or lend credence to his claims of totally disabling pain. Further, no doctors placed limitations on Reno that would preclude performance of medium work. Accordingly, I find that the ALJ did not err in discounting Reno's subjective complaints, because those complaints were not supported by the medical evidence.[43]

### *Conclusion*

The undersigned finds that substantial evidence of record supports the ALJ's decision. Accordingly, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** and the case be **DISMISSED**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P.**

---

[43] Although this issue was not presented, the undersigned notes that the ALJ did not err in his Step 5 analysis. The presence of nonexertional limitations generally precludes the use of the Guidelines. Fraga v. Bowen, 810 F.2d 1296 (5th Cir. 1987). If those impairments, however, do not have a significant effect on the claimant's residual functional capacity, the Guidelines may be applied. Id. Here, since Reno's limitations do not allow him to perform the full range of medium work, the ALJ did not rely on the Medical Vocation Guidelines for medium work in deciding whether Reno was disabled. Rather, the ALJ determined that Reno could perform unskilled sedentary work relying on the Guidelines, Rule 2003.00 of Appendix 2, and Social Security Ruling 85-15 as a framework, the ALJ concluded that there are jobs which exist in substantial number which Reno could perform. Accordingly, the ALJ did not err in finding that Reno was not disabled.

6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See **Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana on __November 30__, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)